IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | : : : |
| Plaintiff, | : : |
| v. | : Civil Action No. 1:25-cv-7491 |
| ELISEO JOJO PRISNO and P/E CAPITAL INVESTMENT MANAGEMENT PARTNERS, | : JURY TRIAL DEMANDED : : : |
| Defendants. | : : |

# COMPLAINT

Plaintiff United States Securities and Exchange Commission ("SEC") alleges:

1. From at least February 2019 through at least July 2023 ("Relevant Period"), Defendant Eliseo Jojo Prisno and Defendant P/E Capital Investment Management Partners ("P/E Capital"), an investment adviser he controlled (together, the "Defendants"), violated the federal securities laws by charging many of their advisory clients inflated, unauthorized, and unearned fees.

2. Defendants oftentimes did so by signing in to their clients' brokerage accounts using their clients' login credentials—frequently without their clients' knowledge or consent—and then routing multifactor authentication texts to phone numbers under Defendants' control. Through this scheme and other deception, they cumulatively charged over 220 advisory client accounts approximately $2.4 million in

unauthorized and undisclosed quarterly fees—on top of the disclosed annual advisory fees. Prisno was personally enriched by charging these fees.

3. By engaging in this conduct, Defendants violated Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1) and 80b-6(2)]. Defendants will continue to violate the federal securities laws unless restrained or enjoined by this Court. The SEC therefore seeks a judgment against Defendants that includes: (a) imposing permanent injunctive relief, including prohibiting Prisno from acting as or being associated with a broker, dealer, or investment adviser; (b) ordering disgorgement of ill-gotten gains plus prejudgment interest; and (c) imposing civil monetary penalties.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this action pursuant to Sections 209(d) and 214(a) of the Advisers Act [15 U.S.C. §§ 80b-9(d) and 80b-14(a)].

5. In connection with the conduct alleged in this Complaint, Defendants directly or indirectly made use of the means or instruments of transportation and communication in interstate commerce, or of the mails, or of the facilities of a national securities exchange.

6. Venue is proper in this Court because acts, practices, and courses of business constituting violations alleged herein have occurred within the jurisdiction of the United States District Court for the Northern District of Illinois. Prisno resides in this district, and P/E Capital's principal place of business is in this district.

**DEFENDANTS**

7. **Eliseo Jojo Prisno**, age 58, is a resident of Chicago, Illinois. Prisno and his wife are co-owners and managers of P/E Capital. Prisno is the majority owner, Chief Executive Officer, Chief Compliance Officer, and "Senior Investment Advisor" of P/E Capital. He provides all advisory services on behalf of P/E Capital and effectively controls the company and its securities investment decisions. At all times during the Relevant Period, Prisno was an "investment adviser" as that term is defined in the Advisers Act.

8. **P/E Capital Investment Management Partners** is an Illinois partnership with its principal place of business in Chicago, Illinois. It was founded in 2010 and has been registered as an investment adviser with the state of Illinois since September 2014, as well as with California, Indiana, and conditionally with Texas since 2021. As of July 2021, P/E Capital reported having 150 clients and assets under management of approximately $40,500,000. As of January 2025, it reported having 120 clients and assets under management of approximately $20,500,000. At all times during the Relevant Period, P/E Capital was an "investment adviser" as that term is defined in the Advisers Act.

**FACTUAL ALLEGATIONS**

**I.  BACKGROUND**

9. Defendants provide discretionary investment management services to clients, most of whom are of Filipino descent and live either in the Philippines or the United States. Many of P/E Capital's clients are not experienced investors.

3

10. Defendants entered into investment advisory relationships with and owed a fiduciary duty to each of its clients. P/E Capital collected advisory fees from its clients. It charged its clients annual fees based on a percentage of their assets under management ("Advisory Fee"). During the Relevant Period, Defendants disclosed the following information about fees in P/E Capital's Form ADV Part 2A Brochure ("Brochure"), which Defendants provided to at least some advisory clients:

    (a) P/E Capital charged its clients who had accounts at Brokerage Firms A and B Advisory Fees of either 2% or 2.4%.

    (b) P/E Capital did not charge any performance-based fees.

    (c) P/E Capital billed for its services in arrears; it did not charge the clients in advance or solicit or require prepayment of fees.

    (d) Beginning with its Brochure filed August 18, 2021, P/E Capital first disclosed that it would charge accounts at Brokerage Firm A enrolled in its "Growth Hedge (Nasdaq 100) MIP Program" 50% of "Realized Credit Options Revenue Share," defined as "realized gains derived from writing Derivatives."

11. These were the only fees P/E Capital disclosed to Defendants' clients who had accounts at Brokerage Firm A or Brokerage Firm B.

12. Prisno signed the amendments to P/E Capital's Form ADVs, including the amendments to the Brochure filed during the Relevant Period.

**II.    DEFENDANTS CHARGED MORE THAN $2.4 MILLION IN UNDISCLOSED AND UNAUTHORIZED FEES TO CLIENTS WITH TRADING ACCOUNTS AT BROKERAGE FIRM A.**

13.    Brokerage Firm A permitted P/E Capital's clients to pre-authorize quarterly invoicing by P/E Capital up to a set, authorized dollar limit ("Quarterly Fee Cap"). During the Relevant Period, Defendants used this Quarterly Fee Cap to charge unearned and unauthorized quarterly fees—above and beyond the disclosed Advisory Fees—to many client accounts held at Brokerage Firm A ("Added Fees").

14.    Here's how they did it: First, Defendants would facilitate the client's opening of a brokerage account with Brokerage Firm A by creating a username, password, and account security questions for the client on Brokerage Firm A's online platform. While some clients changed their passwords, others continued to use the password provided to them by P/E Capital. This enabled Defendants to access a client's account without her knowledge. The brokerage account opening documents supplied to the client included no reference to any Added Fees.

15.    Second, P/E Capital would provide Brokerage Firm A with the client's purported contact information, which oftentimes included a mobile phone number and an email address controlled by Defendants, not the client.

16.    Third, Defendants—oftentimes within 30 days of the opening of the brokerage account—would sign in with P/E Capital's adviser username and password ("Adviser Login") to request a Quarterly Fee Cap. This request, in turn, would trigger Brokerage Firm A's request directed to the client for her approval.

5

17. <u>Fourth</u>, Defendants would use the client's login credentials to log into her Brokerage Firm A account portal. Defendants would circumvent Brokerage Firm A's multifactor authentication by routing the authentication code—which the brokerage firm intended for the client—to themselves.

18. <u>Fifth</u>, once Brokerage Firm A's system authenticated the user, Defendants—still posing as their client—would then pretend to approve P/E Capital's request to establish a Quarterly Fee Cap.

19. <u>Sixth</u>, P/E Capital would then sign in as itself—using its Adviser Login—and invoice its client for an Added Fee, which oftentimes amounted to the Quarterly Fee Cap.

20. While the amount of the Added Fees varied over time and by account, during the Relevant Period the Added Fees on average amounted to more than ***twice to three times*** the disclosed Advisory Fees. In other words, while P/E Capital disclosed Advisory Fees of 2% or 2.4%, it actually charged these clients an average of ***more than 7% of assets under management***—totaling more than $2.4 million in Added Fees charged to at least 220 client accounts. These Added fees were not disclosed to clients in P/E Capital's Brochure or marketing materials.

21. Many, if not all, of these clients who were charged Added Fees did not know that P/E Capital was charging fees above and beyond the disclosed Advisory Fee, and had not agreed to the Added Fees, including Clients A, B, and C.

22. **Client A**. When Client A invested with P/E Capital in 2020, he was not aware he would pay any fees other than the Advisory Fee and did not agree to Added

6

Fees. Yet during the Relevant Period, Defendants charged him over $10,000 in Added Fees—*tripling* the total fees he paid P/E Capital.

23. **Client B**. On or around September 24, 2019, P/E Capital used its Adviser Login to request Added Fees from a Brokerage Firm A account held by P/E Capital Client B. Client B never authorized P/E Capital to charge any fees other than Advisory Fees. But two days later someone logged into Client B's account, from the same IP address as the person at P/E Capital who used the Adviser Login to request the Added Fees, and approved the request. Client B never so much as saw—let alone approved—the fee request.

24. **Client C**. Client C opened an account at Brokerage Firm A in October 2020, with only the 2.4% Advisory Fee listed in the account application. Prisno's phone number was set for multi-factor authentication. A Quarterly Fee Cap was later added in March 2021 and then raised in November 2021. The "client approval" for these Quarterly Fee Caps did not come from Client C. Rather, the Adviser Login request and purported Client Login approval both came from IP addresses that had been used to approve Added Fees in many other accounts.

25. In all, for at least 167 Quarterly Fee Cap changes, both the fee request from the Adviser Login and the purported fee approval from the Client Login originated from the same IP address.

26. After charging their clients the Added Fees for more than four years, Defendants misconduct stopped when, in or around August 2023, Brokerage Firm A notified Defendants that it would close P/E Capital's advisory account.

7

**III. DEFENDANTS CHARGED UNDISCLOSED AND UNAUTHORIZED FEES TO CLIENTS WITH TRADING ACCOUNTS AT BROKERAGE FIRM B.**

27. P/E Capital disclosed that clients' accounts held at Brokerage Firm B would be charged an Advisory Fee (2% before July 15, 2021 and 2.4% after July 15, 2021), which was supposed to be paid from the accounts in six annual increments, every 60 days.

28. P/E Capital was responsible for calculating the advisory fees to be deducted from the account by Brokerage Firm B.

29. P/E Capital overcharged many of its Brokerage Firm B clients. During the Relevant Period, P/E Capital charged many client accounts at Brokerage Firm B with fees inconsistent with and higher than the disclosed and agreed-upon Advisory Fee.

30. Numerous accounts were also billed at a frequency other than the disclosed frequency of once every 60 days.

**IV. DEFENDANTS' ILL-GOTTEN GAINS**

31. Of the more than $3.3 million in fees P/E Capital received from its clients during the Relevant Period, more than $2.4 million came from Added Fees charged to clients' accounts held at Brokerage Firm A, and more than $100,000 came from overbilling advisory fees to clients' accounts held at Brokerage Firm B.

32. In the Relevant Period, Prisno transferred at least $2.9 million from P/E Capital to Prisno's personal checking account, through which he paid for personal expenses.

## V. DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES TO THEIR CLIENTS.

33. Defendants are investment advisers. As such, they owe each client affirmative duties of utmost good faith, care, loyalty, full and fair disclosure of all material facts, and to act in the client's best interests.

34. By engaging in the conduct described above, Defendants breached their duties to their clients, including by charging undisclosed, unauthorized, and unearned fees in amounts without any basis, and by deceptively accessing client accounts through client logins and bypassing multifactor authentication to approve such fees.

35. Defendants' misrepresentations and omissions regarding the Added Fees were material. In making a decision to use Defendants as an investment adviser that made investment decisions on their behalf, a reasonable investor would have considered it important that—rather than charging the fees disclosed and represented to clients—Defendants instead charged undisclosed, unauthorized, and unearned fees to client accounts, in many cases without client authorization.

36. Defendants acted with scienter. At the time Defendants charged their advisory clients inflated, unauthorized, undisclosed, and unearned fees, Defendants knew or recklessly disregarded that their representations to prospective advisory clients regarding the fees charged to clients' accounts were false, misleading, and omitted material information. Defendants knew, or recklessly disregarded, that they received, and were continuing to receive, millions of dollars of manually invoiced quarterly fees, on top of the disclosed annual advisory fees. Defendants acted with scienter, recklessly, or

9

negligently by failing to ensure that they only charged their clients the fees they had disclosed to their clients.

## VI. PRISNO'S CONTINUING MISCONDUCT

37. In 2022, Defendants began undertaking to transition at least some of their P/E Capital clients to other platforms, including Ashtree Block Ventures LLC ("Ashtree"), another investment adviser that Prisno controlled.

38. Between about September 2022 and March 2024, Prisno registered Ashtree with the SEC as an "internet adviser" because he hoped the SEC's imprimatur would attract and retain investors and clients. Prisno filed a Form ADV for Ashtree claiming it had $5 million in assets under management and 94 clients. Prisno did so despite knowing that Ashtree was not operational, had zero clients, and zero assets under management. Even after SEC staff told Prisno that Ashtree was not eligible to register as an "internet adviser," Prisno did not immediately withdraw Ashtree's registration. Only after SEC staff told Prisno that it would be withdrawing Ashtree's registration did he do so on his own initiative.

## VII. THIS ACTION IS TIMELY FILED.

39. The misconduct at issue in this Complaint occurred between about February 2019 and at least July 2023.

40. Defendants entered into agreements with the SEC in which they agreed to toll any statute of limitations applicable to the conduct and claims alleged herein between March 20, 2024 and August 17, 2025.

# CLAIMS FOR RELIEF

## COUNT I

*Against Defendants Eliseo Jojo Prisno and P/E Capital Investment Management Partners for Violations of Section 206(1) of the Advisers Act*

41. The SEC realleges and incorporates by reference paragraphs 1 through 40 as if fully set forth herein.

42. Defendants Eliseo Jojo Prisno and P/E Capital Investment Management Partners, while acting as investment advisers, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly and indirectly employed devices, schemes, or artifices to defraud clients and prospective clients.

43. Defendants Eliseo Jojo Prisno and P/E Capital Investment Management Partners knowingly or recklessly engaged in the conduct described above.

44. By engaging in the conduct described above, Defendants Eliseo Jojo Prisno and P/E Capital Investment Management Partners have violated, and, unless restrained and enjoined, will in the future violate Section 206(1) of the Advisers Act [15 U.S.C. § 80b-6(1)].

## COUNT II

*Against Defendants Eliseo Jojo Prisno and P/E Capital Investment Management Partners for Violations of Section 206(2) of the Advisers Act*

45. The SEC realleges and incorporates by reference paragraphs 1 through 40 as if fully set forth herein.

46. Defendants Eliseo Jojo Prisno and P/E Capital Investment Management

Partners, while acting as investment advisers, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly and indirectly engaged in transactions, practices, or courses of business which operate as a fraud or deceit upon clients and prospective clients.

47. Defendants Eliseo Jojo Prisno and P/E Capital Investment Management Partners knowingly or recklessly engaged in the conduct described above.

48. By engaging in such conduct, Defendants also acted negligently. By engaging in the conduct described above, Defendants Eliseo Jojo Prisno and P/E Capital Investment Management Partners have violated, and, unless restrained and enjoined, will in the future violate Section 206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)].

## **RELIEF REQUESTED**

**WHEREFORE**, the Commission requests that the Court:

### I.

Find that Defendants violated the federal securities laws as alleged herein.

### II.

Enter injunctions, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining Defendants from violating, directly or indirectly, Sections 206(1) and 206(2) of the Advisers Act by committing or engaging in specified actions or activities relevant to such violations.

### III.

Enter injunctions, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure and pursuant to Sections 21(d)(1) and (5) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) (1), (5)], permanently restraining and enjoining Defendants from, directly or indirectly, acting as or being associated with any broker, dealer, or investment adviser.

### IV.

Order Defendants to disgorge the ill-gotten gains that they received, directly or indirectly, from the violations alleged herein, including prejudgment interest, pursuant to Sections 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(5), (7)].

### V.

Order Defendants to pay civil monetary penalties pursuant to Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)] in an amount to be determined by this Court.

### VI.

Retain jurisdiction over this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

### VII.

Grant such other relief as the Court deems appropriate.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands that this case be tried to a jury on all issues so triable.

Dated: July 3, 2025  **UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

 */s/ Alyssa Qualls*
Alyssa Qualls IL Bar No. 6292124
Jonathan Polish, IL Bar No. 6237890
Daniel Griffin, IL Bar No. 6289624
Bradley Lewis, IL Bar No. 6297027
175 West Jackson Boulevard, Suite 1450
Chicago, Illinois 60604
(312) 353-7390
(312) 353-7398 (FAX)
QuallsA@sec.gov
PolishJ@sec.gov
GriffinD@sec.gov
LewisB@sec.gov

***Attorneys for Plaintiff United States Securities and Exchange Commission***